**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------- x

DANIELLE CALVELLO and MICHAEL     :
BORDIERI, JR.,     :
    :     Civil Action No.
          Plaintiffs,     :
    :
          v.     :     **COMPLAINT**
    :
DJO GLOBAL, INC., DJO, LLC, STEVEN     :
SCANSAROLI, JAMES L. DUNCAN, JOHN     :     **Demand for Jury Trial**
DOES 1-3, and JANE DOES 1-3,     :
    :
          Defendants.     :
    :
--------------------------------------------------------- X

Plaintiffs Danielle Calvello and Michael Bordieri, Jr. hereby allege:

### PRELIMINARY STATEMENT

1.    Plaintiffs Danielle Calvello and Michael Bordieri, Jr. are former sales representatives of Defendants DJO Global, Inc. and DJO, LLC (together "DJO" or the "Company"), who complained about blatant sexual harassment by their supervisor Steven Scansaroli and were subject to egregious retaliation as a result.  The sexual harassment included telling Ms. Calvello, "**I just posted a picture of you in a bikini at the monthly meeting. We all had a good laugh**," "**you must have spent too much time deep throating**," and referring to Ms. Calvello's "**banging body**" and her breasts as "**built-in flotation devices**."  Despite Plaintiffs' repeated complaints, nothing was done to remedy this behavior, and as a result Plaintiffs were forced to leave DJO.  Thereafter, DJO and its employees have bad-mouthed Ms. Calvello and Mr. Bordieri throughout the community, spreading complete and utter lies about them and the manner in which they conduct their business, potentially hampering their business reputations and relationships for the remainder of the careers.  Moreover, in retaliation for

Plaintiffs' protected complaints, Defendants have repeatedly threatened to bring an action against Plaintiffs.

2.      Plaintiffs bring this action for damages and injunctive relief for Defendants' unlawful employment practices, including creating a hostile work environment, discrimination and retaliation (and aiding and abetting) in violation of the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* ("NYSHRL") and/or the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. §§10:5-1 *et seq.*, as well as causes of action for common law defamation and defamation *per se*.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, due to diversity of citizenship, as the Plaintiffs are residents of New York and Defendants are residents of California, New Jersey and Maryland, and because this action involves an amount in controversy in excess of $75,000, exclusive of interest and costs.

4.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district, and Defendants have corporate offices that can be found and conduct business in this district.

## PARTIES

5.      Plaintiff Danielle Calvello is a former employee of DJO who was constructively discharged from her position as Senior Territory Manager as of March 11, 2015.  Ms. Calvello is a resident of the State of New York and at all relevant times met the definition of an "employee" and/or "eligible employee" of Defendants under all applicable statutes.

6.      Plaintiff Michael Bordieri, Jr. is a former employee of DJO who was constructively discharged from his position as Senior Territory Manager as of March 11, 2015.

Mr. Bordieri is a resident of the State of New York and at all relevant times met the definition of an "employee" and/or "eligible employee" under all applicable statutes.

7.      Defendant DJO Global, Inc. is a domestic business corporation organized under the laws of the State of Delaware, with its principal place of business at 1430 Decision Street, Vista, California 92081.  At all relevant times, Defendant DJO Global, Inc. met the definition of "employer" and/or a "covered employer" under all relevant statutes.

8.      Defendant DJO, LLC is a Limited Liability Company organized under the laws of the State of Delaware, with its principal place of business at 1430 Decision Street, Vista, California 92081.  At all relevant times, Defendant DJO, LLC met the definition of "employer" and/or a "covered employer" under all relevant statutes.

9.      Defendant Steven ("Steve") Scansaroli was an employee and/or agent of Defendants DJO Global, Inc. and/or DJO, LLC until his termination in early 2015. Scansaroli is a resident of New Jersey.

10.     Defendant James ("Jim") L. Duncan is and was at all relevant times herein an employee and/or agent of Defendants DJO Global, Inc. and/or DJO, LLC. Duncan is a resident of Maryland.

11.     Defendants John Does 1-3 and Jane Does 1-3 are unknown employees or agents of DJO that also made false and defamatory statements about Plaintiffs as described in this Complaint.

## ADMINISTRATIVE PROCEDURES

12.     Plaintiffs will be filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII of the Civil Rights Act of

1964 ("Title VII").  Following receipt of a Notice of Right to Sue, Plaintiffs will seek leave to file an Amended Complaint to include claims under Title VII.

13.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### Background

14.     DJO is a global developer, manufacturer and distributor of medical devices for musculoskeletal health, vascular health and pain management.  DJO devices and products are marketed to orthopedic specialists, surgeons, primary care physicians, pain management specialists, physical therapists, chiropractors, athletic trainers and other medical professionals, as addressing wide ranging needs in patient care, from injury prevention and rehabilitation to degenerative diseases.

15.     Ms. Calvello began working with DJO products in or around 2009, after she was hired by Spinal Associates, a distributorship of DJO.  In or around January 2011, DJO hired Ms. Calvello as a Territory Manager for Westchester, Putnam and Duchess Counties.

16.     In or around 2011, Mr. Bordieri was hired as a Territory Manager.  Mr. Bordieri's territory assignment was Northern New Jersey.

17.     The job duties of a Territory Manager is responsible for identifying, qualifying and cultivating all potential sales leads and prospects, while developing and maintaining customer relationships and a positive market image for the company.  Responsibilities also include achieving and maintaining quota, servicing patient, fitting patients for the products, submitting paperwork and seeing sales through completion.

18.     In or around 2013, after two years of consistently meeting their sales quotas for bone stimulation products ("stims"), Ms. Calvello and Mr. Bordieri were promoted to Senior Territory Managers in their respective territories, which is accompanied by a salary increase.

19.     For nearly four years, Ms. Calvello and Mr. Bordieri worked tirelessly for, and contributed consistently to, the Company's increased revenue in the tri-state region through creating and maintaining key customer relationships in their territories.

20.     In 2012, both Ms. Calvello and Mr. Bordieri were included in the "Company's Circle of Excellence," recognizing that both were among the top six sales representatives in the Recovery Sciences Division for the entire Company.

21.     During each year of her tenure, Ms. Calvello was one of the top five sales representatives in the Company based on revenue produced.

22.     At all relevant times, Ms. Calvello and Mr. Bordieri were in an intimate relationship.

**Hostile Work Environment**

23.     During Plaintiffs' employment, Mr. Scansaroli repeatedly subjected Plaintiffs and others in the Company to hostile work environment permeated with sexually charged comments and actions offensive toward women.

24.     Ms. Calvello was personally subjected to Mr. Scansaroli's sexually charged and offensive comments and actions on numerous occasions.  For example, in or around August 2014, when Ms. Calvello was out of the office on vacation, Mr. Scansaroli sent a text message to Ms. Calvello stating: "**I just posted a picture of you in a bikini at the monthly meeting. We all had a good laugh**."  Upon information and belief, the image was posted at the meeting in front of 12 to 15 of Ms. Calvello's co-workers.

25.     At times when Ms. Calvello would say she felt ill or had a headache, Mr. Scansaroli would respond, "**you must have gotten your head hit against the headboard too hard**," or, "**you must have spent too much time deep throating**."

26.     Mr. Scansaroli told Ms. Calvello that one woman had a, "**banging body**" with her, "**new and improved tits**."  Mr. Scansaroli also stated that another woman's breasts, "**had to be fake**."  Mr. Scansaroli frequently commented on the bodies of female employees, specifically their breasts.

27.     Mr. Scansaroli regularly made sexually charged and gender offensive comments to Mr. Bordieri knowing he was in a relationship with Ms. Calvello.  For example, if Ms. Calvello called out sick from work, Mr. Scansaroli would exclaim to Mr. Bordieri: "**You must have given it to her too hard last night!**"

28.     In or around December 2014, Mr. Scansaroli told Mr. Bordieri: "**I'm tired of Danielle swinging my big dick around**."

29.     If Ms. Calvello and Mr. Bordieri were late to a meeting or had separated from the team at a national sales meeting, Mr. Scansaroli would announce to employees that Ms. Calvello and Mr. Bordieri were busy, "**having a quickie**."

30.     During a discussion about Mr. Bordieri not being able to swim, Mr. Scansaroli assured Mr. Bordieri that Ms. Calvello's breasts were, "**built-in flotation devices**."

31.     In or around January 2015, at the Company's national sales meeting, Mr. Scansaroli stated to employees on the New York and New Jersey teams that a female senior territory manager had an Indian girlfriend, "**whose vagina must smell like curry.**" Mr. Scansaroli previously "joked" about this woman not having a boyfriend and always, "**going**

**home alone to her dog**" and suggested that her wanting to go on sales visits with him was an indication that she wanted to have sex with him.

32.     When Mr. Scansaroli was late to one meeting, he apologized by telling employees Sharon Wolfington, President of DJO's Global Recovery Sciences Unit, answered her home door in, "**next to nothing**" and told them she, "**invited me in**," indicating he was late because of a sexual tryst.

33.     In addition to his actions at work, Mr. Scansaroli publicly posted online sexually charged and gender offensive pictures, including:

34.     Posting a picture on Instagram of him with an exhibit of the "Atomic Bomb" positioned on his genital area:



35.     Posting a picture on Instagram of a woman's cleavage:



36.     Posting a picture on Facebook a picture of him at a wedding posing with a phallic

object between his legs:



37.     Mr. Scansaroli also made the work environment hostile through racially offensive comments about Black employees.

38.     For example, after firing Garett Wilson, who had been the only Black employee on his team, Mr. Scansaroli told employees, "**Now we are all on the same team**."

39.     As another specific example, in or around the beginning of March 2015, after acquiring the New York City Territory, Mr. Scansaroli told Ms. Calvello that he planned to, "**fire the tootsie roll**," referring to Chrissy Bruner, a Black sales representative.

40.     Mr. Scansaroli's discriminatory attitudes were also reflected in the many racist internet memes that he group texted to employees and referenced in monthly meetings.

**Discriminatory and/or Retaliatory Denials of Promotions/Requests to Transfer**

41.     After Mr. Scansaroli told Ms. Calvello that he posted a picture of her in a bikini at the monthly meeting, Ms. Calvello complained to Dan Driver, then-Area Vice President of DJO and Mr. Scansaroli's direct manager, about Mr. Scansaroli's conduct.

42.     During this conversation, Ms. Calvello expressed fear that she would be retaliated against if Mr. Scansaroli learned she complained.  Mr. Driver explained that any conduct that made Ms. Calvello uncomfortable was unacceptable and assured her that he would report it to Human Resources ("HR") who would contact Ms. Calvello to discuss the situation further.

43.     However, no one from HR ever followed up with Ms. Calvello and Mr. Scansaroli's offensive comments and conduct continued.

44.     Thereafter, Ms. Calvello and Mr. Bordieri were in regular communication with Mr. Driver to express that they were uncomfortable working with Mr. Scansaroli and desperately sought to transfer from his team.  However, Mr. Driver would routinely dismiss their complaints with justifications such as: "**That's just Steve being Steve**," and "**You know how Steve is**."

45.     Demonstrating how seriously they desired a transfer, Ms. Calvello and Mr. Bordieri proposed several ways they could transition off of Mr. Scansaroli's team, including appointments to new roles, creating a distributorship and changing sales territories entirely.

46.     For example, in or about August 2014, Mr. Bordieri offered to relinquish his New Jersey territory and transfer to Connecticut.  When Mr. Driver asked whether his request for a transfer was merely to get off of Mr. Scansaroli's team, Mr. Bordieri confirmed that it was. Instead, a new Connecticut Territory Manager was hired from outside DJO and Mr. Bordieri was never considered for the role.

47.     Mr. Scansaroli also stepped in to prevent Ms. Calvello's promotion to a more senior position.  In or around October 2014, Mr. Scansaroli informed Ms. Calvello that Ms. Wolfington wanted to promote Ms. Calvello to be the Area Sales Manager in New York City. Mr. Scansaroli told Ms. Calvello that he responded, "absolutely not" if it meant taking Ms. Calvello off of his team.  As a result, Ms. Calvello did not receive this promotion.

48.     In or about December 2014, after Jim Duncan took over as Area Vice President, Ms. Calvello again requested to transfer from Mr. Scansaroli's team to be Area Sales Manager of the New York City territory.

49.     Initially, Mr. Duncan supported the transfer, told Ms. Calvello that she was "perfect for the job," and that he wanted to finalize the transfer as soon as possible prior to a sales meeting on January 22, 2015.

50.     However, when Mr. Scansaroli learned that Ms. Calvello was a candidate for the position, he immediately reprimanded her for not consulting him before she spoke to Mr. Duncan, ordering her to, "respect the chain of command."

51.     Shortly thereafter, Ms. Calvello learned that she was no longer considered for the position.  Upon information and belief, Mr. Scansaroli told Mr. Duncan that he would not agree to Ms. Calvello transferring to the New York City territory unless that territory was added to his own and he could remain her Branch Director.

52.     Mr. Scansaroli appeared to act with a sense of immunity, and he regularly stated to his employees, "**No one can do anything to me because I am a top performer**."  That sentiment rang true for years as DJO conveniently disregarded Ms. Calvello and Mr. Bordieri's complaints about him.

**Constructive Discharge and Threats of Retaliation**

53.     After nearly four years of working with Mr. Scansaroli and desperately seeking Company intervention, Plaintiffs could no longer tolerate the hostile working conditions and the lack of remedial measures.

54.     As such, on or about March 11, 2015, Ms. Calvello and Mr. Bordieri were constructively discharged.

55.     Ms. Calvello and Mr. Bordieri met with Mr. Scansaroli that morning to notify him of their intent to leave.  Mr. Scansaroli's immediate response was, "**go fuck yourselves**."  He then told Ms. Calvello and Mr. Bordieri that they should watch out for Ms. Wolfington because she is a, "**vindictive cunt**."

56.     When Ms. Calvello and Mr. Bordieri inquired as to whether they could continue working with the Company as wholesale partners and purchase DJO products, Mr. Scansaroli answered that collectively, he, Ms. Wolfington and Mr. Duncan would respond: "**go fuck yourselves**."

57.     That same day, Ms. Calvello and Mr. Bordieri notified Mr. Duncan that they were forced to leave the Company due to, *inter alia*, the hostile work environment created by Mr. Scansaroli.  During this conversation, Ms. Calvello and Mr. Bordieri also specifically alerted Mr. Duncan that Mr. Scansaroli called Ms. Wolfington a, "**vindictive cunt**" and Mr. Duncan, "**a pussy**."

58.     Ms. Calvello and Mr. Bordieri expressed that they could no longer work for a Company that allowed a Branch Director to create an unrelenting hostile work environment and repeatedly ignored employees' requests for corrective action.

**Unlawful Retaliation and Defamation**

59.     Two days later, on March 13, 2015, Mr. Scansaroli emailed Ms. Calvello and Mr. Bordieri's former accounts, falsely stating that if either Ms. Calvello or Mr. Bordieri approached them with DJO products, they should contact him for an immediate exchange, as any product, "**will be a knock off or pre-owned (illegal) unit**."

60.     Mr. Duncan was copied on several of Mr. Scansaroli's emails.

61.     Mr. Scansaroli's statements are false as Ms. Calvello and Mr. Bordieri have not sold any "knock off" or pre-owned DJO units during their employment at DJO or anytime thereafter.  Such statements are also highly damaging to Plaintiffs' careers as medical sales professionals as it harms their professional reputations and relationships.

62.     Mr. Scansaroli also told customers that Ms. Calvello and Mr. Bordieri had been charging them higher rates than the DJO price.

63.     This accusation was also completely false and damaging to Ms. Calvello and Mr. Bordieri as they consistently sold products to their accounts at the DJO price.

64.     Upon information and belied, Mr. Scansaroli made additional false, malicious and defamatory statements regarding Plaintiffs as well.

65.     Several customers reached out to Ms. Calvello and Mr. Bordieri because they were upset and questioned the veracity of Mr. Scansaroli's emails.  Indeed, one of Ms. Calvello's former accounts sent an email to Ms. Calvello stating:

> "**Your x boss thinks you will sell "fake" stims . . . This Steve [Scansaroli] guy is disgusting and telling me the stims are only $1850. Who's the head of the company, they need to know how unprofessional, insulting and degrading he is. You should sue him. I'd like to call the president and tell him/her how unprofessional they are**."

66.     Mr. Scansaroli's statements have damaged the characters and reputations of Ms. Calvello and Mr. Bordieri.

67.     Mr. Scansaroli's statements were retaliatory and intentionally made to injure the business reputations of Ms. Calvello and Mr. Bordieri. Mr. Scansaroli's statements were made during the course of his employment, and in his capacity as a DJO employee.  Moreover, DJO was well aware of Mr. Scansaroli's conduct and permitted, condoned and acquiesced to his conduct.

68.     On or about March 17, 2015, Ms. Calvello and Mr. Bordieri requested by email that the Company immediately cease and desist making these untrue and retaliatory comments and requested formal retraction of Mr. Scansaroli's defamatory statements to date.  Ms. Calvello's email to the Company attached a formal letter addressed to DJO detailing specific instances of Mr. Scansaroli's discriminatory and harassing behavior over the past several years, including the examples contained in this Complaint.

69.     On or about March 18, 2015, Garry Roberson, DJO's Director of Human Resources, telephoned Ms. Calvello and Mr. Bordieri to confirm receipt of these emails and notified them that the Company refused to retract the emails Mr. Scansaroli sent to customers.

70.     On or about that same day, Ms. Calvello received a telephone call from Melissa Lannert, DJO sales representative, informing her that Mr. Scansaroli wanted a message relayed to Ms. Calvello and Mr. Bordieri:  "**You tell those two fucking cunt bags that they succeeded in ruining my life**."  Apparently, DJO fired Mr. Scansaroli.

71.     Not only did DJO intentionally ignore the hostile work environment created by Mr. Scansaroli to protect the steady profits earned by his top performing team, but it permitted Mr. Scansaroli to retaliate against Ms. Calvello and Mr. Bordieri following their protected complaints by making false and defamatory statements about Ms. Calvello and Mr. Bordieri to third parties.

72.     DJO is complicit in Mr. Scansaroli's retaliatory conduct.  The retaliation against and defamation of Ms. Calvello and Mr. Bordieri, perpetuated by Mr. Scansaroli and tolerated by the Company, have damaged Ms. Calvello's and Mr. Bordieri's reputations for the remainder of their careers.

73.     Thereafter, following a letter from Ms. Calvello's and Mr. Bordieri's attorney, upon information and belief, Mr. Duncan, Ryan Christopherson, Vice President of Sales, and Dan Sullivan, a local Territory Manager, have visited the offices of Ms. Calvello and Mr. Bordieri's former accounts and announced that Ms. Calvello and Mr. Bordieri are, "**running a scam**" by, "**stealing units**" from DJO, selling repurposed units and, "**defrauding insurance companies**."

74.     These statements are false and defamatory.

75.     Upon information and belief, Mr. Duncan told DJO Area Representatives that Ms. Calvello and Mr. Bordieri were engaged in, "**illegal activity**," including that Ms. Calvello and Mr. Bordieri were taking used DJO products, re-selling them and then re-billing clients for the products.

76.     These statements are false and defamatory.

77.     Upon information and belief, Mr. Duncan also stated to DJO employees: "**Mike was making up his own prescription pads with DJO's information on them and using them illegally**."

78.     These statements are false and defamatory.

79.     Upon information and belied, Mr. Duncan has made additional false, malicious and defamatory statements regarding Plaintiffs as well.

80.     Upon information and belief, Jim Stern, a contracted sales representative for DJO, has been going into the offices of Ms. Calvello's former accounts and announcing **that Ms. Calvello has been "arrested" and "put in jail" for "selling illegal units"** and "**running a scam.**"  Mr. Stern has told these accounts that Ms. Calvello has now been barred from entering any medical buildings.  Ms. Calvello has never met Mr. Stern and has never had any business dealings with him.

81.     These statements are false and defamatory.

82.     Upon information and belied, Mr. Stern has made additional false, malicious and defamatory statements regarding Plaintiffs as well.

83.     Upon information and belief, DJO employee Mr. Sullivan works closely with Mr. Stern and has directed Mr. Stern to publicize this false information.  Also, upon information and belief, Mr. Sullivan has also made similar statements to sales representatives outside of DJO.

84.     Mr. Duncan and Mr. Sullivan have also made statements that Ms. Calvello and Mr. Bordieri are using, "**stolen units**" and involved in, "**illegal activity**" to professionals in medical offices located in Connecticut, a territory in which Ms. Calvello and Mr. Bordieri never conducted business for DJO and only have recently been working.

85.     Upon information and belied, Mr. Sullivan has made additional false, malicious and defamatory statements regarding Plaintiffs as well.

86.     After being contacted by Mr. Duncan and Mr. Sullivan, a Connecticut account which had been working with Ms. Calvello and Mr. Bordieri has suddenly refused to continue to work with them.  This Connecticut client explained that he could no longer work with Ms. Calvello and Mr. Bordieri due to these serious allegations against them by Mr. Duncan and Mr. Sullivan.

87.     These false and defamatory statements made by DJO employees and agents about Ms. Calvello and Mr. Bordieri relate to their professional competence and the quality and safety of any of the medical devices that Ms. Calvello and Mr. Bordieri sell.

88.     These false and defamatory statements about Ms. Calvello and Mr. Bordieri were made by DJO employees and agents who were acting within the scope of their employment, at the direction and/or control of Defendants, under the express or implied authority of Defendants and/or in furtherance of Defendants' interests.

89.     These false and defamatory statements about Ms. Calvello and Mr. Bordieri were made by DJO employees and agents were made knowing the statements were false or with reckless disregard to the truth of the statements and for the purpose of causing damage to Ms. Calvello and Mr. Bordieri.

90.     Defendants' actions have irreparably harmed Ms. Calvello and Mr. Bordieri's reputations and their ability to procure employment and/or income.

91.     Moreover, in retaliation for Plaintiffs' protected activity, Defendants have repeatedly threatened to bring an action against Plaintiffs for purportedly violating restrictive covenant.  In fact, Plaintiffs have not violated any enforceable restrictive covenant and Defendants are threatening to bring an action to chill Plaintiffs' protective activity and further interfere Plaintiffs' ability to earn a living.

**FIRST CAUSE OF ACTION**
**(Hostile Work Environment in Violation of the NYSHRL)**
***Against Defendants DJO and Scansaroli***

92.     Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

93.     Defendants DJO and Scansaroli fostered, condoned, accepted, ratified, aided and abetted and/or otherwise failed to prevent or to remedy a sexually charged and gender-offensive hostile work environment that materially altered the working conditions of Plaintiffs, which constitutes unlawful discriminatory practices and conduct in violation of the NYSHRL.

94.     Plaintiffs have been aggrieved by Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct in violation of the NYSHRL.

95.     As a direct and proximate result of Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct, Plaintiffs have suffered, and continue to suffer, mental anguish and emotional distress for which they are entitled to an award of damages.

96.     As a direct and proximate result of Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct, Plaintiffs have suffered, and continue to suffer monetary

and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

97.     Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights supporting an award of punitive damages under the NYSHRL.

## SECOND CAUSE OF ACTION
### (Hostile Work Environment in Violation of the NJLAD)
### *Against Defendant DJO and Scansaroli*

98.     Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

99.     Defendants DJO and Scansaroli fostered, condoned, accepted, ratified, aided and abetted and/or otherwise failed to prevent or to remedy a sexually charged and gender-offensive hostile work environment that materially altered the working conditions of Plaintiffs, which constitutes unlawful discriminatory practices and conduct in violation of the NJLAD.

100.    Plaintiffs have been aggrieved by Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct in violation of the NJLAD.

101.    As a direct and proximate result of Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct, Plaintiffs have suffered and continue to suffer, mental anguish and emotional distress for which they are entitled to an award of damages.

102.    As a direct and proximate result of Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct, Plaintiffs have suffered and continue to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

103.    Defendants DJO and Scansaroli's unlawful discriminatory practices and conduct were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs' rights supporting an award of punitive damages under the NJLAD.

**THIRD CAUSE OF ACTION**
**(Discrimination and/or Retaliation in Violation of the NYSHRL)**
***Against All Defendants***

104.    Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

105.    By the actions described above, among others, Defendants unlawfully discriminated against and/or retaliated against Plaintiffs in violation of the NYSHRL for engaging in protected activities and for their opposition to the unlawful conduct of Defendants by, *inter alia*, (1) impeding promotions and requests to transfer; (2) publishing numerous false statements to third parties which tend to impugn Plaintiffs; and (3) fostering, condoning, accepting, ratifying and/or otherwise failing to prevent their agents from publishing numerous false statements to third parties which tend to impugn Plaintiffs in their trade, business, profession and otherwise have a harmful effect on Plaintiffs.

106.    Plaintiffs have been aggrieved by Defendants' unlawful discrimination and retaliation in violation of the NYSHRL.

107.    As a direct and proximate result of Defendants' unlawful discriminatory and/or retaliatory practices and conduct, Plaintiffs have suffered, and continue to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

108.    As a direct and proximate result of Defendants' unlawful discriminatory and/or practices and conduct, Plaintiffs have suffered, and continue to suffer monetary and/or economic

harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

109.    Defendants' unlawful discriminatory and/or retaliatory practices and conduct were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs rights supporting an award of punitive damages under the NYSHRL.

110.    The Individual Defendants are liable as an aider and abettor.

## FOURTH CAUSE OF ACTION
### (Discrimination and/or Retaliation in Violation of the NJLAD)
### *Against All Defendants*

111.    Plaintiffs repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

112.    By the actions described above, among others, Defendants unlawfully discriminated against and/or retaliated against Plaintiffs in violation of the NYSHRL for engaging in protected activities and for their opposition to the unlawful conduct of Defendants by, *inter alia*, (1) impeding promotions and requests to transfer; (2) publishing numerous false statements to third parties which tend to impugn Plaintiffs; and (3) fostering, condoning, accepting, ratifying and/or otherwise failing to prevent their agents from publishing numerous false statements to third parties which tend to impugn Plaintiffs in their trade, business, profession and otherwise have a harmful effect on Plaintiffs.

113.    Plaintiffs have been aggrieved by Defendants' unlawful discrimination and retaliation in violation of the NJLAD.

114.    As a direct and proximate result of Defendants' unlawful discriminatory and/or retaliatory practices and conduct, Plaintiffs have suffered, and continue to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

115.     As a direct and proximate result of Defendants' unlawful discriminatory and/or practices and conduct, Plaintiffs have suffered, and continue to suffer monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which she is entitled to an award of damages.

116.     Defendants' unlawful discriminatory and/or retaliatory practices and conduct were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiffs rights supporting an award of punitive damages under the NJLAD.

117.     The individual Defendants are liable as an aider and abettor.

**FIFTH CAUSE OF ACTION**
**(Defamation *Per Se*/Defamation)**
***Against All Defendants***

118.     Plaintiffs repeat and re-allege each allegation contained in each of the preceding paragraphs as if fully set forth herein.

119.     As described above, DJO's employees published numerous false statements to third parties which tend to impugn Plaintiffs in their trade, business, profession and otherwise have a harmful effect on Plaintiffs, including that the Plaintiffs were engaged in "running a scam" by "stealing units" from DJO, selling "knock off or pre-owned (illegal) units," re-billing clients for units, "defrauding insurance companies," and that Plaintiff Calvello was, "arrested," and "put in jail," for "selling illegal units."

120.     These statements were untrue and defamatory in that they falsely reported Plaintiffs' professional character, actions and statements, and were made with the intent to harm Plaintiffs professionally and retaliate against Plaintiffs for their protected complaints.

121.     DJO's employees' made the defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

122.    DJO's employees' statements, set forth above, are capable of only one reasonable interpretation – a defamatory one.

123.    DJO's employees' statements constitute defamation per se because they plainly and openly disparage Plaintiffs' trade, profession and business, and otherwise tend to subject Plaintiffs to ridicule, contempt or disgrace.

124.    DJO's employees' statements constitute defamation *per se* because they plainly and openly charge Plaintiffs with serious criminal activity.

125.    DJO knew and/or should have known that its agents and/or employees were engaged in tortious and/or defamatory conduct, and approved, ratified and/or acquiesced to the conduct of its employees.

126.    As a result of DJO's employees' defamation *per se*, Plaintiffs have suffered damages in an amount to be determined at trial.  DJO's employees' statements have harmed Plaintiffs' professional reputation and standing in their industry, have caused them economic harm, have caused them to incur special damages in the form of actual pecuniary loss, including lost income, benefits, job security and opportunities for career advancement and have caused them embarrassment, humiliation and emotional injury.

127.    DJO's employees were acting within the scope of their employment when making these false statements about the Plaintiffs, and made these false statements at the direction or control of Defendants, under the express or implied authority of DJO and/or in furtherance of DJO's interests.  Mr. Scansaroli is personally liable for the defamatory statements he made on behalf of DJO.

128.    DJO's employees' defamatory statements were malicious, willful, wanton and made with reckless disregard for Plaintiffs' rights and in retaliation for Plaintiffs' protected complaints.  As such, Plaintiffs are entitled to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and against Defendants for the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate state and common law;

B.    An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the retaliatory practices and defamatory statements about Plaintiffs complained of herein;

C.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages, including, but not limited to all monetary and/or economic damages incurred as a result of Defendants' unlawful actions;

D.    An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiffs' mental anguish and emotional distress;

E.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiffs, including, but not limited to, loss of income, earned bonus pay, reputational harm and harm to professional reputation, in an amount to be determined at trial, plus interest;

F.      An award of punitive damages in an amount to be determined at trial;

G.      Pre-judgment and post-judgment interest, as applicable, on all amounts due;

H.      An award of costs that Plaintiffs have incurred in this action, including, but not limited to, Plaintiffs' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: June 29, 2015
       New York, New York

                            Respectfully submitted,

                            **WIGDOR LLP**


                            By: _____
                                David E. Gottlieb
                                Bryan Arbeit

                            85 Fifth Avenue
                            New York, NY 10003
                            Telephone: (212) 257-6800
                            Facsimile: (212) 257-6845
                            dgottlieb@wigdorlaw.com
                            barbeit@wigdorlaw.com

                            *Attorneys for Plaintiffs*